IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
ALBANY DIVISION

| | | |
|---|---|---|
| BRADY TANNER *et al.*, | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | CASE NO.: 1:12-CV-33 (WLS) |
| | : | |
| TPUSA, INC., | : | |
| | : | |
| Defendant. | : | |
| _____ | : | |

## ORDER

Before the Court is Defendant TPUSA, Inc.'s Motion to Decertify the Class (Doc. 191). TPUSA filed its memorandum in support of its Motion to Decertify the Class on August 19, 2015 and filed its actual Motion to Decertify the Class on August 20, 2015. (Docs. 188, 191.) After receiving an extension of time from the Clerk's office, Plaintiffs filed a response on September 23, 2015. (Doc. 195.) TPUSA filed its reply on October 13, 2015 (Doc. 199), though it was due on October 7, 2015, fourteen days after Plaintiffs filed their response brief. M.D. Ga. L.R. 7.3. TPUSA has provided no explanation or excuse for its untimely reply brief; however, because Plaintiffs have filed no objection, the Court will consider the brief. The Court finds that the Motion to Decertify the Class (Doc. 191) is now ripe for review.

### PROCEDURAL and FACTUAL BACKGROUND

This is a Fair Labor Standards Act case against TPUSA, Inc., a corporation operating call centers in Albany and Augusta, Georgia. Plaintiffs are former customer service representatives (CSRs) who allege that TPUSA's timekeeping software and practices deprived them of due compensation. They brought a putative collective action seeking a declaratory judgment, unpaid wages, liquidated damages, and attorneys' fees.

In their Second Amended Complaint, Plaintiffs identify TPUSA's use of a software program called TP Agent as one cause of their unpaid wages. TP Agent tracks compensable

1

time by recording time stamps whenever an employee, for example, logs into the program or takes a mandatory lunch break. TP Agent interfaces with another software program called CCMS to compile time records used to calculate compensation. Plaintiffs contend that TP Agent itself produces inaccurate reports during software or equipment failure. Plaintiffs assert that manual time adjustments and an automatic time-fill are also inaccurate and at best recompense estimates of lost time. Plaintiffs also attribute their unpaid overtime wages to an alleged TPUSA policy requiring employees to report to work fifteen minutes before each shift to find an available workstation and to log into TP Agent. This time, they assert, is uncompensated.

On February 20, 2014, after a limited discovery phase and briefing from the Parties, the Court certified the following putative collective class:

> All current and former employees of TPUSA, who were employed as Customer Service Representatives in the State of Georgia during the statutory period, and who:
> (a) during a work week, worked off-the-clock for at least one (1) hour and did not receive any compensation at [their] regular rate of pay; and/or
> (b) [were] not paid regular wages and/or overtime compensation at a rate of 1.5 times their regular rate of pay, for hours in a work week in excess of forty (40).

(Doc. 82 at 8; Doc. 63 at 10.)

After receiving notice of the collective action, 478 plaintiffs opted into the lawsuit. (Doc. 195 at 1.) However, after several stipulations and TPUSA's numerous motions to dismiss opt-in plaintiffs who failed to comply with discovery requests, only 231 opt-in plaintiffs remain in the action. Now, TPUSA moves to decertify that collective class. (Doc. 191.)

The Court notes TPUSA's assertion that Plaintiffs appear to have abandoned their minimum wage claim since their proposed trial plan (Doc. 149) focuses exclusively on the alleged overtime violations. (Docs. 63 at 13-15; 188 at 7 n. 3.) TPUSA focused its Motion to Decertify on the alleged overtime violations, and Plaintiffs neither objected to this nor made arguments in support of their alleged minimum wage claim in their response brief. (*See* Doc. 195.) The Court therefore concludes that Plaintiffs have indeed abandoned their minimum wage claim and the only claim remaining is one for overtime pay.

2

Finally, the Court notes TPUSA's objections to the deposition transcripts filed as exhibits to Plaintiffs' response brief. (Docs. 199-1 *et seq.*) TPUSA is correct in asserting that these transcript excerpts were not filed in compliance with Local Rule 5.1, which requires that they be filed together with a statement certifying that they have been used in the proceedings or ordered to be filed by the Court. TPUSA also contends that these transcript excerpts are not properly authenticated. The Court notes that the transcript excerpts at least contain the court reporters' certifications. Nevertheless, Plaintiffs have indeed failed to comply with Local Rule 5.1. However, the Court, in its discretion, will consider the transcript excerpts, though they are incomplete, for purposes of ruling on the pending Motion to Decertify. The Court determines that to do so is especially fair in light of the fact that the Court is considering TPUSA's untimely reply brief, which also was not filed in compliance with the Local Rules. The Court also finds, in light of the findings and conclusions set forth below, that considering the transcript excerpts for purposes of the Motion to Decertify the Class will not prejudice any Party.

## **DISCUSSION**

### I. Decertification Standard

The FLSA allows employees deprived of overtime compensation to file suit on behalf of themselves and "other employees similarly situated." 29 U.S.C. § 216(b). In relevant part, Section 216(b) of the FLSA provides:

> An action to recover . . . may be maintained against any employer . . . in any Federal or State court of competent jurisdiction by any one or more employees for and [on] behalf of himself or themselves and other employees similarly situated. No employee shall be a party plaintiff to any such action unless he gives his consent in writing to become such a party and such consent is filed in the court in which such action is brought.

*Id.* Unlike a Rule 23 class action, a putative plaintiff in a collective action must choose to affirmatively join the class by filing his or her written consent to be bound by the judgment. *Id.*; *Hipp v. Liberty Nat'l Life Ins. Co.*, 252 F.3d 1208, 1216 (11th Cir. 2001). A district court may authorize notice to potential opt-in plaintiffs in "appropriate" cases. *Hoffman-La Roche Inc. v. Sperling*, 493 U.S. 165, 169 (1989).

The Eleventh Circuit recommends a two-part approach to providing notice to and certifying a collective class under the FLSA. *Hipp*, 252 F.3d at 1218 (quoting *Mooney v. Aramco Servs. Co.*, 54 F.3d 1207, 1213–14 (5th Cir. 1995)). During the first stage, the Court determines based on the pleadings and limited discovery whether the action should be "conditionally certified" and whether notice should be sent to the putative plaintiffs. *Id.* At the initial stage, the plaintiffs bear the burden of showing a "reasonable basis" for their claim that there are other similarly situated employees who wish to opt in. *Anderson v. Cagle's, Inc.*, 488 F.3d 945, 952 (11th Cir. 2007); *see also Dybach v. Fla. Dep't of Corr.*, 942 F.2d 1562, 1567–68 (11th Cir. 1991)). The Eleventh Circuit has described the standard for this first stage as "'not particularly stringent,' 'fairly lenient,' 'flexib[le],' 'not heavy,' and 'less stringent than that for joinder under Rule 20(a) or for separate trials under 42(b).'" *Morgan v. Family Dollar Stores, Inc.*, 551 F.3d 1233, 1261 (11th Cir. 2008) (citations omitted). A motion to authorize notice "typically results" in conditional certification. *Hipp*, 252 F.3d at 1218.

The second stage is "typically precipitated by a motion for 'decertification' by the defendant usually filed after discovery is largely complete and the matter is ready for trial." *Id.* The second stage requires more than "allegations and affidavits" to maintain certification. *Morgan*, 551 F.3d at 1261 (quoting *Anderson*, 488 F.3d at 953). More specifically, plaintiffs must show "*liability* on a class-wide basis." *Briggins v. Elwood TRI, Inc.*, 882 F.Supp.2d 1265, 1267 (N.D. Ala. 2012). After the second stage of discovery, plaintiffs must be able to show that "'the similarities necessary to maintaining a collective action . . . extend beyond the mere facts of job duties and pay provisions' and encompass the defenses to some extent." *Morgan*, 551 F.3d at 1262 (quoting *Anderson*, 551 F.3d at 953).

The court may consider a number of factors, such as "(1) disparate factual and employment settings of the individual plaintiffs; (2) the various defenses available to defendant[s] [that] appear to be individual to each plaintiff; [and] (3) fairness and procedural considerations[.]"*Anderson*, 488 F.3d at 953. In other words, a court must engage in a more searching inquiry while reviewing a motion for decertification; however, the requirement that collective action members be "similarly situated" is less stringent than the similar Federal Rule of Civil Procedure 23 class action requirement, the Rule 20 joinder requirements, or the

4

Rule 42 severance requirements. *Grayson v. K-Mart Corp.*, 79 F.3d 1086, 1095, 1106 (11th Cir. 1996). If the court decertifies the class, the opt-in plaintiffs are appropriately dismissed without prejudice, and the named original plaintiffs proceed to trial on their individual claims. *Hipp*, 252 F.3d at 1218.

## II.   The Parties' Contentions

### A.  TPUSA's Arguments

TPUSA seeks decertification, arguing that the Plaintiffs are not similarly situated because not all opt-in Plaintiffs were eligible for overtime pay, not all opt-in Plaintiffs were subject to policies requiring early arrival, not all opt-in Plaintiffs used TP Agent, and not all Plaintiffs were deprived of overtime pay as a result of TP Agent's failures. (*See* Doc. 188.)

As to Plaintiffs' allegations that they were subject to an early-arrival policy requiring them to report fifteen minutes early for each shift without compensation, TPUSA argues that not all CSRs were subject to such policies because they were supervisor-implemented rather than a company-wide policy. (*Id.* at 188 at 11, 13 (citing to deposition testimony in which Plaintiffs stated that they had not heard of such a policy and citing to one Plaintiff's deposition in which she stated that she was required to report early only during part of her time as a TPUSA employee).) TPUSA names deponents who stated that they were given manual exception time for time spent waiting for a workstation to become available. (*Id.* at 12.) TPUSA argues that because of the various experiences of CSRs with the alleged early-arrival policy and the alleged failure to compensate CSRs for time spent waiting for a workstation to become available, the class-members are not similarly situated.

As to Plaintiffs' allegations that TPUSA's use of the time-keeping software TP Agent deprived them of overtime pay, TPUSA argues that "there is simply no potential for a systematic failure to record 2% of all work time as claimed by Plaintiffs." (*Id.* at 17.) TPUSA notes that, as of October 2014, forty of the opt-in Plaintiffs had used Time Clock software instead of TP Agent during at least part of their employment with TPUSA and some of those Plaintiffs never used TP Agent at all. (Doc. 188 at 15 (citing Doc. 198-1 at 16); *Id.* at 20.) TPUSA further argues that TP Agent "automatically fills gaps in time of less than 3-minutes between the initial login and final logout, even when the system reports 'unknown

status'" and that "larger intra-day gaps are dealt with via manual exception." (*Id.* at 17 (original emphasis omitted).) TPUSA also notes that CSRs were regularly overcompensated for lunch periods during which they logged in before the end of their thirty minute lunch period. (*Id.* at 14-15 n. 10.) TPUSA cites to various depositions and written discovery responses in which Plaintiffs stated they had no evidence of having worked without pay or could not provide an estimate of how much unpaid time they had worked. (*Id.* at 17-20.) And TPUSA also notes that different supervisors maintained different practices with regard to manual time adjustments. (*Id.* at 21-22.) TPUSA argues that the lack of evidence of a systematic failure to compensate Plaintiffs for overtime worked makes decertification proper. (*Id.* at 20.)

Finally, TPUSA notes that not all Plaintiffs qualified for overtime during their employment with TPUSA, even crediting them with the alleged unpaid early arrival and system failure times, and that those who did work overtime did not do so every week. (*Id.* at 22-23.)

### B. Plaintiffs' Arguments

In response to TPUSA's Motion to Decertify, Plaintiffs argue that CSRs are uniformly deprived of overtime pay by TPUSA's timekeeping software and by TPUSA's policy requiring early arrival. (*See generally* Doc. 195.) Plaintiffs argue that CSRs were deprived of pay by TPUSA's timekeeping software, TP Agent and CCMS, which "produce[s] inaccurate time stamp data [due to] software or equipment failure and due to human error." (Doc. 195 at 9.) Plaintiffs state, "[F]or every 40 hour work week, each CSR loses a minimum of 48 minutes on TP Agent," and seem to attribute this failure primarily to TP Agent's tendency to enter "unknown status." (*Id.*) Plaintiffs cite to the deposition transcript of Robert Feeney, who stated that if a workstation went into "unknown status," the CSR would be moved to a different station and a positive time adjustment would be made for that CSR. Feeney stated he did not know exactly what "unknown status" meant. (Doc. 35 at 185.) When asked if "unknown status" meant that a CSR's time was not being recorded correctly, Feeney stated that he did not know. (*Id.* at 186.) Plaintiffs also cite the transcript of Larry Sell's deposition. Sell stated that he had "reporting" that indicated that TP Agent ran in working status 98% of the time. (Doc. 32 at 53.) When asked if the remaining two percent was "unknown status," Sell stated that he did not know. (*Id.*)

6

Second, Plaintiffs argue that CSRs were deprived of overtime pay because "manual time adjustments and automatic time-fill are also inaccurate and at best, arbitrary estimates." (Doc. 195 at 9.) Plaintiffs contend that such adjustments are inaccurate because "there is no available scientific methodology available to TPUSA[] to precisely measure the actual time lost[]" when TP Agent goes into "unknown status" or otherwise fails to record CSRs work time accurately. (Doc. 195 at 5.) Plaintiffs argue that TP Agent is not 100% reliable and that TPUSA's placing the onus of reporting time discrepancies on CSRs is unlawful. (*Id.* at 6.)

Plaintiffs also argue that CSRs were deprived of overtime pay by a requirement that CSRs report to work at least fifteen minutes early, without compensation, "in order to avoid waiting for a functioning and available workstation." (Doc. 195 at 11, 12.) Plaintiffs cite as exemplars several deponents' testimony that they were aware of and/or complied with such a policy. (*Id.* at 12-16.)

## III.   Analysis

In order for a class-wide verdict to be possible in this action, Plaintiffs must establish that TPUSA is liable for failing to pay overtime wages to all class members because (1) the class members were not paid overtime for any required early arrival time that may have qualified as overtime and/or (2) the class members were denied overtime pay as a result of TPUSA's timekeeping software's failure to record CSRs' time accurately and/or because any auto-exceptions or manual adjustments made to correct such errors were also inaccurate.[1] The Court notes that a number of the Parties' arguments more directly address the merits of Plaintiffs' claims rather than the decertification standard; the Court herein considers only those arguments that relate to the pending Motion to Decertify the Class.

### A.   Disparate Factual and Employment Settings of the Individual Plaintiffs

TPUSA argues that decertification is proper because each individual plaintiff's factual setting is so unique that liability ultimately cannot be determined on a class-wide basis. In response, Plaintiffs argue that they are similarly situated, and their claims can be proven at trial through representative testimony.

---

[1] *See supra* at 2 for discussion of Plaintiffs' abandoned minimum wage claim.

7

In *Morgan v. Family Dollar Stores, Inc.*, the Eleventh Circuit considered an appeal of a FLSA action brought by store managers who alleged failure to pay overtime due to Family Dollar's considering all store managers as exempt from overtime pay. 551 F.3d at 1241. The Circuit affirmed a district court's denial of decertification where the district court found that plaintiffs were sufficiently similarly situated based on a number of commonalities among the opt-in plaintiffs, including "their universal classification as store managers," "their day-to-day responsibilities," "the restrictions on their power to manage stores," and "their receiving base salaries regardless of the hours worked and overtime pay." *Id.* at 1262-63. In contrast, another District Court held, "Plaintiffs' argument that not every [p]laintiff has to actually be owed overtime compensation in a collective action solely seeking overtime damages is without merit." *Rindfleisch v. Gentiva Health Servs., Inc.*, 22 F.Supp.3d 1295, 1303 (N.D. Ga. 2014).

Taken together, *Morgan* and *Rindfleisch* support this Court's and other courts' conclusion that distinctions among plaintiffs' individual damages may not be a basis for decertification but where class-wide liability is not established, decertification is appropriate. *Briggins*, 882 F.Supp.2d at 1267. The court in *Briggins* went on to conclude:

> Although the defendants have all but admitted that off-the-clock work sometimes occurs, the court nevertheless has not found sufficient consistency among the certified class, and notes that so many variables govern whether a plaintiff works off the clock that to determine the defendants' liability, and not merely its damages, would require individual testimony.

*Id.* at 1258.

Here, as Plaintiffs note, the opt-in Plaintiffs share a number of commonalities –the same job title, duties, and day-to-day responsibilities. (Doc. 195 at 10.) However, that is where the class-wide commonalities stop. This case is like *Briggins*. While TPUSA concedes that some CSRs were required by their supervisors to report to work early, individual inquiries would need to be made as to which and for how long CSRs were subject to such a policy and how many of those unpaid off-the-clock hours, if any, were overtime hours.[2] Likewise, as to the allegation that TP Agent's inaccuracies resulted in unpaid overtime, individualized

---

[2] As previously discussed, since the minimum wage claim has been abandoned, the only damages sought by Plaintiffs are for unpaid *overtime.*

inquiries would have to be made as to which CSRs even used TP Agent, since some did not; which CSRs did not receive full payment through auto-exceptions and manual adjustments; and where CSRs' worked time not counted by TP Agent and not accurately accounted for via auto-exceptions and manual adjustments, whether any of that time was unpaid overtime. All of these questions ultimately go to TPUSA's *liability* for overtime violations as to each Plaintiff, not just *damages* as Plaintiffs contend. For example, even if a CSR was not paid for 2% of her time because of TP Agent's inaccuracies, TPUSA would not be liable to that CSR in this action if she cannot show that some amount of that time would have qualified as overtime. Or, even if a CSR reported fifteen minutes early each day and was not compensated for that time, TPUSA would not be liable to that CSR in this action if he cannot show that some amount of that early-arrival time would have qualified as overtime.

If it were clear that every CSR was entitled to overtime pay during at least one week of his or her employment at TPUSA and that every CSR was actually subjected to the early arrival policy and/or uncounted and uncompensated work time, the individualized inquiries would, as Plaintiffs contend, go to *damages*. However, that is not the case. First, not every opt-in Plaintiff qualified for overtime during his or her employment with TPUSA. After reviewing TPUSA's expert report (Docs. 198-1) together with the Court's Orders dismissing various opt-in Plaintiffs throughout the course of this litigation, the Court finds that twelve (of 231 total) remaining opt-in Plaintiffs never exceeded forty hours in a work week and were thus never eligible for overtime pay during their employment with TPUSA.[3]

Next, not every opt-in Plaintiff was required to report to work early. Some deponents testified that they had never heard of such a requirement. (Doc. 188 at 13 (citing deposition transcripts).) Some Plaintiffs testified that they had to wait for a seat to become available and some testified to no wait times. (Doc. 188 at 11-12 (citing deposition transcripts).) Some managers utilized a "no seats" list when no seats were available so that they could document CSRs' arrival time and make manual adjustments to their time records to reflect their actual

---

[3] TPUSA's expert calculated the percentage of each opt-in Plaintiff's work weeks that would not have exceeded forty hours even if credited with the 2% and fifteen minute early arrival unpaid time alleged by Plaintiffs. A "100%" is reflected in the far right-hand column of Exhibit 1 to TPUSA's expert report (Doc. 198-1) for those opt-in Plaintiffs who worked no overtime eligible weeks. Twelve is the total number of *remaining* opt-in Plaintiffs who worked no overtime eligible weeks according to TPUSA's expert.

9

arrival times as opposed to their eventual login times. (Doc. 188 at 12 (citing declarations and deposition transcripts).)

Also, not every opt-in Plaintiff used TP Agent, the allegedly flawed software that resulted in unpaid overtime. According to TPUSA's expert, as of October 2014, forty of the opt-in Plaintiffs had used Time Clock software instead of TP Agent during at least part of their employment with TPUSA and some of those Plaintiffs never used TP Agent at all. (Doc. 188 at 15 (citing Doc. 198-1 at 16); *Id.* at 20.) Further, as to those opt-in Plaintiffs who did use TP Agent, some testified that they had not experienced any discrepancies between their pay and the time they worked, and some opt-in Plaintiffs could point to no basis for their belief that the alleged flaws with TP Agent resulted in their not being paid overtime. (Doc. 188 at 17-20 (citing to various depositions and written discovery responses from Plaintiffs); *Id.* at 24 (same).) Some opt-in Plaintiffs did not remember their TP Agent software ever being in "unknown status." (Doc. 199 at 8 (citing deposition transcripts).) Other Plaintiffs could not dispute that they were paid for any time their computer was in "unknown status." (*Id.* (citing deposition transcripts).) According to TPUSA, forty-seven Opt-In Plaintiffs stated under oath they were paid for all time worked, and seventy-seven declarants stated as much. (Doc. 199 at 12.)

Plaintiffs continue to maintain that the representative testimony they will introduce at trial will prove their claims. (Doc. 195 at 19.) However, as the Sixth Circuit explained, "The lead plaintiffs bear the burden of showing that the opt-in plaintiffs are similarly situated to the lead plaintiffs." *O'Brien v. Ed Donnelly Enter., Inc.*, 575 F.3d 567, 584 (6th Cir. 2009). Here, TPUSA has produced evidence demonstrating that not all of the opt-in plaintiffs are entitled to overtime and not all of the opt-in plaintiffs were subjected to one or both of the unlawful policies or practices alleged by Plaintiffs. Unlike in *Morgan* where representative testimony could show whether the managerial exemption applied to class members because the class members shared a common job title and duties, representative testimony cannot show that all class members were subject to the same practices, particularly where there is evidence in the record as it now stands that this was not the case –some class members were not entitled to overtime pay even under the most generous calculations; some class members were not

subjected to an early reporting requirement; some class members did not use TP Agent at all; some class members testified that they had not experienced any discrepancies between their pay and the time they worked; and some class members could point to no basis for their belief that the alleged flaws with TP Agent resulted in their not being paid overtime. *Morgan*, 551 F.3d at 1263-1265. Representative testimony will not suffice here where it is clear that not all class members are similarly situated to the named Plaintiffs. *See O'Brien*, 575 F.3d at 586 ("'[One opt-in plaintiff] is clearly not similarly situated to the lead plaintiffs[] because she failed to allege that she suffered from either unlawful practice.'").

Based on the above, the Court concludes that the Plaintiffs in this action are not similarly situated such that trying this case as a collective action would be manageable or fair. In this case, as in *Briggins*, "so many variables govern whether a plaintiff works off the clock that to determine the defendants' liability, and not merely its damages, would require individual testimony." 882 F.Supp.2d at 1258.

### B. Various, Individualized Defenses

The second decertification factor articulated by the Eleventh Circuit requires the Court to consider whether the defendant's defenses are so "individually tailored to each plaintiff as to make [the] collective action unwarranted or unmanageable." *Morgan*, 551 F.3d at 1263. In *Morgan v. Family Dollar Stores, Inc.*, the Eleventh Circuit considered whether the applicability of FLSA's "executive exemption" defense was so inherently individualized as to warrant decertification. 551 F.3d at 1246, 1263. The Circuit concluded that while application of executive exemption was an inherently fact-based inquiry, overwhelming evidence showed that "the [p]laintiffs, as a group, shared a number of factual details with respect to their job duties and day-to-day work" such that a determination could be made as to whether the executive exemption applied to all or none of the class members. *Id.* at 1263, 1280.

TPUSA lists a number of defenses it would raise as to individual Plaintiffs –some of which are arguments denying liability for failure to pay overtime based on the disparities discussed above. (Doc. 188 at 24-28.) TPUSA also contends that at least one Plaintiff is disqualified from participating in this action because she had a live bankruptcy proceeding at the

11

time this action was filed and that other opt-in Plaintiffs are susceptible to impeachment. (*Id.* at 26.)

The Court finds the defense regarding the single opt-in Plaintiff who may be disqualified from this action unpersuasive because TPUSA does not provide evidence that this defense applies to more than one Plaintiff (*see* Docs. 188 at 26; 188-18 at 5) and because TPUSA could have moved to dismiss that plaintiff prior to the dispositive motion deadline. However, to the extent that outright denial of liability is a "defense," the Court has already found that such a defense could and likely will be raised on a plaintiff-by-plaintiff basis because of the disparate experiences throughout the class. Further, as to the issue of individual impeachment, the Court finds the *Briggins* court's reasoning to be persuasive, "That the defendants would have to question and impeach individual plaintiffs, because no representative testimony exists as to the extent of a plaintiff's unpaid overtime, is a point the court must consider in deciding whether the plaintiffs are similarly situated and whether a collective action is proper in this case." 882 F.Supp.2d at 1276. Here, there are opt-in Plaintiffs who have plainly contradicted themselves and each other and whose impeachment should be allowed even if they are not called as representative witnesses. (Doc. 188-18 at 2.)

### C. Fairness and Procedural Considerations

As to the third decertification factor, the Court considers whether collectively litigating this action would be inherently unfair for any reason. *Morgan*, 551 F.3d at 1264. The Court finds that where a tenuous second-stage class exists, fairness and procedural considerations support decertification. *See Anderson v. Cagle's, Inc.*, 1:00-cv-166 (WLS) at 11-12 (M.D. Ga. Mar. 31, 2015). Here, the named Plaintiffs cannot fairly and adequately represent employees who were subject to a variety of different policies and practices regarding arrival times, timekeeping software, and manual time adjustments. Therefore, decertification is warranted.

### D. Partial Decertification

While the Eleventh Circuit has not considered when and if partial decertification is appropriate in FLSA actions, the Sixth Circuit has held, "[A] district court should examine whether partial decertification is possible, when faced with the situation where a subset of

the plaintiffs fail to allege violations of the FLSA." *O'Brien*, 575 F.3d at 586. The Sixth Circuit explained:

> In general, plaintiffs who are not similarly situated—for instance, plaintiffs who did not allege suffering under either unlawful practice—could be dismissed while keeping intact a partial class. Plaintiffs who do present evidence that they are similarly situated to the lead plaintiffs should not be barred from the opportunity to be part of a FLSA collective action . . . .

*Id.* However, after *O'Brien*, the Sixth Circuit considered another FLSA case in which it found that district court did not err in declining to consider partial decertification where the plaintiff failed to propose a subset of similarly situated employees who should remain in the collective action. *Frye v. Baptist Mem'l Hosp.*, 495 F. App'x. 669, 674 (6th Cir. 2012).

Here, Plaintiffs have not proposed or even mentioned the option of partial decertification. (*See* Doc. 195.) Nor has either Party proposed creating subclasses in this action. *See Medina v. Happy's Pizza Franchise, Inc.*, No. 10 C 3148, 2012 WL 1094353 at \*3 (N.D. Ill. Apr. 2, 2012) (discussing various collective actions in which subclasses were created). Rather, Plaintiffs continue to maintain that the representative testimony of some Plaintiffs will be sufficient to prove all Plaintiffs' claims and to allow TPUSA an opportunity to raise all available defenses. (*Id.* at 19.) As the Court has already found, this is not the case where the evidence in the record shows that TPUSA is not liable at all to some opt-in Plaintiffs. It is possible that the putative class in this case could have been more narrowly defined so as to avoid this issue. *See Shipes v. Amurcon Corp.*, 2012 WL 995362 at \*6 (E.D. Mich. March 23, 2012) (discussing the court's discretionary authority to reshape a proposed FLSA class). However, the Court did not have notice at the time of conditional certification that Plaintiffs would abandon their minimum wage claim, and at this late stage in the litigation, the Court finds no other option but to decertify the class because it is clear that liability has not and cannot be established as to the entire class defined by Plaintiffs and conditionally certified by the Court. The Court therefore declines to consider partial certification *sua sponte*.

## **CONCLUSION**

Having weighed the decertification factors articulated by the Eleventh Circuit, the Court finds that a trial in this case would not be manageable as a collective action and that

13

the Plaintiffs are not sufficiently similarly situated to each other for purposes of establishing class-wide liability under the FLSA. For those reasons, Defendant TPUSA's Motion to Decertify the Class (Doc. 191) is **GRANTED**, and all remaining opt-in Plaintiffs in this action are **DISMISSED WITHOUT PREJUDICE**. The remaining named Plaintiffs are Brady Tanner, Tiffany Molden, Elena Evans, Thomas Dupre,[4] Jessica Hermanson, Calondra Haywood, Jolanda Lassiter, Wendy Milner, and Latoya Ford. Those named Plaintiffs' claims remain pending, and since the dispositive motion deadline has lapsed (Doc. 171 at 2) with none having been filed (*see* Docket), the Court finds that those Plaintiffs' claims are ready for trial. This case is therefore set for the Court's **January 2016 Trial Term**, which begins on **Monday, January 4, 2016**.

   **SO ORDERED**, this 9th day of November, 2015.

                                   /s/ W. Louis Sands
                                   **W. LOUIS SANDS, SR. JUDGE**
                                   **UNITED STATES DISTRICT COURT**

---

[4] The Court notes TPUSA's assertion that Thomas Dupre was "dismissed early in the case" (Doc. 199 at 12) but can find no record of his dismissal on the Docket. If the Court is in error, the Parties are directed to file a notice with citation to the Order dismissing Dupre from this action.

14